Bobby L. COLSTON, Plaintiff,

v.

David H. PINGREE, Secretary of the Department of Health and Rehabilitative Services, and John Awad, District Administrator of District II, Department of Health and Rehabilitative Services, Defendants.

No. 79–0782.

United States District Court,
N. D. Florida,
Tallahassee Division.

July 15, 1980.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HIGBY, District Judge.

The Plaintiff, Bobby L. Colston, sues under 42 U.S.C. 2000e et seq., Title VII of the Civil Rights Act, and 42 U.S.C. § 1981, claiming that certain officials of the Florida Department of Health and Rehabilitative Services discriminated against him in their promotion practices. Mr. Colston is black. According to agreement reached at the pretrial conference, the only Defendants to this suit are David Pingree, Secretary of HRS, and Dr. John Awad, District Administrator of District II, HRS. The Plaintiff has proceeded on alternate theories of disparate treatment and disparate impact.

## FINDINGS OF FACT

The Department of Health and Rehabilitative Services (HRS) is Florida's social services agency and the largest agency in the state. It is administered by a Secretary (David Pingree) and is divided into eleven districts. Each district is headed by a District Administrator (in District II, Dr. John Awad). The acts contested in this case took place in District II, an area encompassing eight counties in north Florida.

The Plaintiff's first contact with HRS was in 1970 when he was hired by Dr. James H. Bruce as a Grant Finance employee in the Re-Education Project. At that time Mr. Colston had a B.S. in Sociology and Education from Florida A&M University. When the Re-Education Project ended, Dr. Bruce recommended the Plaintiff for a position with Vocational Rehabilitation (VR) as a Counselor I, effective February, 1971. While working with VR, Mr. Colston pursued an M.S. in Rehabilitative Counseling at Florida State University. Dr. Bruce recommended the Plaintiff for Educational Leave with Pay to enable him to finish his course work while receiving full salary. In 1972, Mr. Colston was promoted to VR Counselor II, and in 1973 he completed his M.S. degree.

Algie R. Cooper, Tallahassee, Fla., for plaintiff.

Donna H. Stinson, Fla. Dept. of HRS, District II, Tallahassee, Fla., for defendants.

The Plaintiff applied for various promotions within HRS, only four of which are in issue in this suit.[1]

### 1. *Vocational Rehabilitation District Program Supervisor*

Plaintiff applied for this position in June, 1976. The minimum training and experience (T&E) requirements were: "Graduation from an accredited four year college or university and six years of experience in vocational rehabilitation, two years of which must have been in an administrative, supervisory, or consultative capacity. A master's degree may be substituted for one year of the required non-supervisory experience." (Plaintiff's Exhibit 67). The Plaintiff did not meet these standards in 1976 when the position was filled. He had undergraduate and advanced degrees but lacked completely the supervisory experience required. Plaintiff offered his employment as a resident group leader at a New Jersey Job Corps Center in 1965–68 as the requisite supervisory experience. I find that this experience was not of the type envisioned by the job description and that Plaintiff was not qualified for the VR Program Supervisor position.

Plaintiff's failure to meet the minimum standards for the position forecloses any legal requirement that further facts be found. I note, however, that the person hired, Britton B. Dennis (a white male), had more experience, had supervisory experience, was already higher in the HRS ranking system, and was "adversely affected."[2] This last job qualification bears explanation.

In 1976, HRS went through a complete, legislatively-mandated reorganization, causing the deletion of thousands of positions and the creation of new ones. Persons holding those jobs deleted were "adversely affected" and were given, by law, priority in applying for new positions. Charles Kimber, who was Deputy District Administrator of District II in 1975–76, testified that two categories of adversely affected employees had to be given priority treatment. On the first level were employees seeking a job essentially equivalent to their previous position. These employees got highest priority. Second level priority belonged to those adversely affected who were seeking a higher level job. When Britton Dennis was hired as VR Program Supervisor he was in this second category. Mr. Colston was not adversely affected, and he has conceded that this criterion was a proper one.

Plaintiff has tried to show that HRS did not follow its own procedures in hiring level two adversely affected employees.[3] The re-

---

1. The Plaintiff originally contested five instances of failure to promote him. At trial, the testimony as to the fifth position became confused, and the Plaintiff abandoned his claim with regard to the District Staff Development and Training Consultant.

2. Mr. Dennis graduated from Florida State University in 1968 with a B.S. in Criminology/Psychology and an M.S. in Rehabilitative Counseling. He was hired at VR in 1968 as a Counselor II; in 1971 he became a Supervising Counselor; and in 1973 he became a District Supervisor for VR.

3. 1. Effective this date all job vacancies that occur as a result of reorganization (Job–O–Grams or other reorganization related position vacancies), must be filled with qualified adversely affected employees. Vacancies will be filled by qualified adversely affected employees who are at the same pay grade as or higher than the vacancy. *Requests to appoint a lower level adversely affected employee to a higher pay grade or a non-affected employee to a position must be approved by the Assistant Secretary for Administrative Services.* It will be possible to approve such requests infrequently. (Selection of Network Managers will be made in accordance with prior procedures, rather than on the basis of this revision.)

Request for exceptions must be in writing and include the following:
 1) Position number and job title to be filled.
 2) Number of qualified adversely affected employees who applied or are available for the position.
 3) Justification as to why a qualified adversely affected employee at the same pay grade or higher should not be appointed to the position.

Applications received for all reorganization related job vacancies will be listed on a Reorganization Placement History Form (copy attached) in descending order by pay grade of adversely affected employees. Appointments must be made from one of the top five qualified employ-

organization rules required approval of the Assistant Secretary of Administrative Services before hiring a level two adversely affected employee. Plaintiff contends that in some instances, approval was not sought and that this failure to follow established procedures creates an inference of discrimination.

Although this argument appears meritorious initially, it does not withstand scrutiny. HRS promulgated elaborate rules and regulations to ease the transition of reorganization, both for the agency and for its employees. The rules applicable to adversely affected employees were intended to assure the rehiring of those whose jobs had been eliminated while holding down the number who would achieve automatic promotion through priority treatment. Even if HRS did fail to follow its prescribed procedures for adversely affected employees, this failure could not have affected Mr. Colston. Nothing in the HRS transition rules could have conferred adversely affected status on Mr. Colston. His job had not been eliminated. If a qualified adversely affected employee were matched with a non-adversely affected employee of exactly equal qualifications, the adversely affected employee had an immediate and legitimate hiring advantage.

### 2. District Intake Specialist

Mr. Colston applied for this position in June, 1976. The minimum T&E requirements were:

> Graduation from an accredited four-year college or university and four years of professional experience in a family or children's counseling program, one year

of which must have been in a [sic] administrative or supervisory capacity.

A master's degree in a social or rehabilitative area may be substituted for one year of the required experience.

Professional experience as required above may be substituted on a year-for-year basis for the required college training. An equivalency diploma issued by a state department of education or by the United States Armed Forces Institute, or a qualifying score on the Division of Personnel Educational Attainment Comparison Test may be substituted for high school graduation.

Again Mr. Colston did not meet the minimum standards for the job. He did have a college degree and counseling experience but lacked any supervisory or administrative experience. Plaintiff argues that his master's degree puts him above the academic requirements and that supervisory experience was not really a necessary part of the Intake Specialist's job function.

Assuming, without deciding, that the Plaintiff was qualified, the qualifications of the person hired were superior. The Intake Specialist was a new position combining the intake functions for dependent and delinquent children. The job required knowledge of the juvenile justice system and of the procedures for dealing with dependent children. Mr. Colston's experience was with clients needing vocational rehabilitation. He had no experience with Florida's juvenile justice system or with family or children's counseling.

Susan Evans, a white female, was hired for the position after special permission was given for her selection.[4] Mrs. Evans had

---

ees with the highest pay grade. The Appointing Official may reach down to the next lower pay grade(s) to obtain qualified adversely affected employees so as to ensure an adequate competitive base of at least five. If the lower pay grade results in reaching more than five adversely affected employees, all may be considered.

If five or more qualified adversely affected employees in the same pay grade as the vacancy, or higher, apply, the Appointing Official may not go below that pay grade without prior approval as outlined above.

4. There is some question as to whether Ms. Evans was adversely affected. Plaintiff's Exhibit 56, a memorandum from District Administrator Charles Cox to the Assistant Secretary for Administrative Services states:

> *Mrs. Susan Evans* is the unanimous choice of the Intake Specialist Interview Team and the District II Administration to be promoted to the District Intake Specialist position. She is not listed on the personnel history form as being adversely affected. Her present job as Youth Counselor Supervisor is adversely affected by virtue of the role and description of

five years experience in an intake supervisory position and one year of supervisory experience in juvenile court work. She had worked as a youth counselor in the juvenile court system and had experience in dependency intake with Family Services.

### 3. Case Assignment Management System (CAMS) Specialist

Plaintiff met the minimum requirements for this position, having a college degree and four years of professional experience with HRS. His qualifications must be compared with those of Barry Kling, the white male who was hired. Under the general heading of qualifications I must again note that Mr. Kling was adversely affected, and that this factor weighs heavily in comparing him with Mr. Colston.

Barry Kling held a B.S. degree from Florida State University and an M.S. in Rehabilitative Counseling. His first employment with HRS was in 1972 when he was hired as a Vocational Rehabilitation Counselor I. In September of 1974 he became administrative assistant to Dr. James Bruce, a position which entailed working on grants, development of resources, monitoring deficiencies in case management and preparation of budgets. Mr. Kling's hiring as CAMS Specialist was recommended by a committee which included Dr. Bruce and Dee Donovan (an Hispanic) and was approved by Deputy District Administrator Charles Kimber, a black.

The CAMS position was a new one created by the reorganization of HRS. The basic function of the job was, "identifying critical areas of need in the district service delivery operation with respect to serving multi-problem clients." [5] The job description shows that the skills needed to perform this new function were predominantly administrative, business, and technical. Mr. Kling's and Mr. Colston's basic qualifications, placed side by side, are approximately equal, but three factors made Kling the better choice: he had administrative experience, the areas of his experience were more suited to the specific requirements of the CAMS position, and most important, he was adversely affected.

### 4. Vocational Rehabilitation Program Analyst

The VR Program Analyst position was described in an information letter (Plaintiff's Exhibit 49) distributed to the districts:

This is a highly responsible position and responsible for: consulting and developing V.R. programs with public and private agencies; developing statewide cooperative agreements and assisting Districts in developing local agreements and programs. Insures local programs compliment statewide goals and objectives. Liaisons with Social and Economic Services, Children's Medical Services, Aging and Adult Services, V.A. and non-profit organizations.

the position changing from detention intake supervision to a single intake supervision function.

5. Plaintiff's Exhibit 37 describes "Distinguishing Characteristics of Work:"

This is responsible work providing technical and consultative assistance to district units in administering a case assignment and management system in the Department of Health and Rehabilitative Services.

An employee in a position allocated to this class is responsible for providing consultative services to program managers, coordinators and case assignment and management system supervisors and assisting them in the establishment, administration and operations of a case assignment and management system. Duties include assisting in establishing and maintaining a district central index sys-

tem file for CAMS cases; monitoring the performance of the CAMS personnel to insure compliance with state and district policies and procedures; providing constant guidance and assistance to service network managers in maintaining an effective and productive network; assisting in providing in-service training to CAMS personnel and client service personnel and the CAM system; and identifying critical areas of need in the district service delivery operation with respect to serving multi-problem clients and makes recommendations for resolution of same.

Work is performed under the general direction of a higher level administrative official and is reviewed through conferences and reports for achievement of desired results.

Minimum T & E: Graduation from a four-year college or university with major course work in rehabilitation or a related field and five years of professional experience in vocational rehabilitation. A Master's Degree in V.R. Counseling or a related field may substitute for one year of required experience.

When the Plaintiff applied for this position in July, 1976, he had the requisite training and experience, as did Rick Wigle, the white male who was eventually hired.

Rick Wigle graduated from Florida State University in 1968 with a B.S. in Psychology and an M.S. in Rehabilitation Counseling. In September of 1968 he began working with VR as a Counselor II. In December, 1971 he became a Supervising Counselor with VR, responsible for supervising five to eight VR Counselors, plus secretarial staff. He worked as a Research Assistant for the Division from September, 1974 to March, 1976 and was involved in program evaluation, monitoring, and planning. Mr. Wigle became a Quality Assurance Monitor in 1976, reviewing cases for effective delivery of rehabilitation services.

The Plaintiff's general qualifications have been discussed previously. His education was comparable to Mr. Wigle's, but he lacked the diversity of VR experience and the administrative background that made Mr. Wigle the more qualified candidate. Again, a factor weighing very heavily in Mr. Wigle's favor was his status as an adversely affected employee.

The Plaintiff repeatedly cites his experience prior to working for VR as evidence of his qualifications for a particular VR position. Mr. Colston's application and resume show three previous positions. From March, 1965 until December, 1968 the Plaintiff worked for the Federal Electric Corporation as a Resident Group Counselor at Kilmer Job Corps Center, Edison, New Jersey. He counseled and advised young people in social behavior and vocational and academic objectives. After about three months, the Plaintiff was promoted to supervisor. He trained and supervised counselors and coordinated dormitory activities. While still working for the Job Corps, Mr. Colston took a part-time position with the Newark, New Jersey, Board of Education as a social studies teacher. The Plaintiff's State of Florida job application shows that from September, 1967 to December, 1968 he worked 40 hours a week for the Job Corps and 20 hours a week as a social studies teacher. (Plaintiff's Exhibit 18). The next job listed is research assistant at Florida State University. This was a full time position with the FSU Institute of Human Development researching "occupational identification of the head of the household."[6] The job lasted for five months. Two months later, in February, 1970, Mr. Colston started working for the HRS Re-Education Project.[7]

The Plaintiff's experience before working for VR is not to be denegrated. It shows a long-term commitment to serving clients in the vocational services field. The Program Analyst position that Mr. Colston sought,

**6.** Plaintiff's complete description of the position, taken from his resume (Plaintiff's Exhibit 9):

> Research Assistant, August 1, 1969, to December, 1969, with the Florida State University Institute of Human Development, Project Minverva. I was responsible for design, organization, analyses and reporting of research efforts on the head of the household, education and vocational training, associated with the Fathers Program. Areas of research were; evaluation of changes in social standing of trainees and research on securing an occupational identification of the head of the household.

> Research in evaluation of changes in social standing of trainees on securing an occupational identification.

**7.** The evidence on Plaintiff's actual starting date with VR is in conflict. Plaintiff's State of Florida job application shows that he started with VR in February, 1970. The Plaintiff's resume, however, gives March, 1969 as the beginning date. The Plaintiff's Proposed Memorandum Decision cites a February, 1974 starting, which must be a typographical error, since Plaintiff was first promoted in 1972. I believe the confusion is due partly to varied characterization of the job with the Re-Education Project, which was apparently grant funded through VR but not a regular VR position.

however, required administrative skills that he had not yet developed. More importantly, the person hired in preference to the Plaintiff, Mr. Wigle, was a former supervisor of Mr. Colston, who had worked for VR at least a year longer than the Plaintiff. In no way was Mr. Colston as well qualified as Mr. Wigle for the Program Analyst position, even when pre-VR experience is considered. The interviewer for this position, Gail M. Downing, interviewed 14 applicants and selected five based on amount of experience. (Plaintiff's Exhibit 51). Mr. Colston was not among the top five candidates, although another black male, William Lee, was.

### General Considerations

#### The HRS Investigation Report

 Plaintiff has raised a host of subsidiary issues which are foreclosed by the legal findings noted below. The Investigation Report which was completed by the HRS Office of Civil Rights deserves some comment, however, because it reaches a conclusion contrary to mine. (Plaintiff's Exhibit 1). This report was admitted into evidence over the objections of the Defendants, who contested the trustworthiness of the document. The report is admissible under Rule 803(8)(C), Fed.R.Evid.; the weight to be given the report is a matter for the court. *Chandler v. Roudebush*, 425 U.S. 840, 863, n. 39, 96 S.Ct. 1949, 1960, 48 L.Ed.2d 416 (1976); *Smith v. Universal Services, Inc.*, 454 F.2d 154 (5th Cir. 1972). I find that the conclusion of Investigator Ada Blount is not supported by her recitation of findings nor by the evidence adduced at trial. If read without the "Conclusion" section, Ms. Blount's "Findings" support the determination that no racial discrimination occurred in this case.

### Statistical Evidence

The Plaintiff and the Defendants have presented a bewildering array of statistical data, consisting primarily of HRS reports compiled according to Equal Employment Opportunity Commission (EEOC) guidelines. After reviewing all the reports of record, I find that the Plaintiff has failed to make a prima facie showing that the Defendants' employment practices have produced a discriminatory effect on black males seeking higher level positions. The Plaintiff distilled from the data the percentage of black males in pay grades 16 and above as compared to the percentage of white males. He also offered comparative figures for the positions he sought. (Plaintiff's Post-Trial Memorandum of Law and Proposed Memorandum Decision). The most that can be said for these figures is that they indicate more white males holding higher level positions than black males. Statistics must be used with precision to show what is sought to be proved. What is missing is a comparison of the number of qualified black males in the relevant labor market with the number of black males actually employed by HRS.

The Defendants' statistical evidence was presented by Ms. Donna Lombardi, Director of the Office of Civil Rights for HRS. In the absence of any contradictory evidence, her testimony is to be believed. In HRS District II in 1976, 19% of all employees had professional status. "Professionals" fall within EEOC Category II, which would include all positions contested in this suit. Black males qualified for these positions comprised 4% of the relevant labor market and were actually employed by HRS at 6.1%; an overrepresentation of 20 persons. The statewide statistics for 1977 show that both black males and black females were overrepresented compared to availability in the work force. In District II in 1978, black males in Category II were overrepresented by .1%. HRS has achieved parity for the relevant labor market with respect to black males in professional positions.[8]

---

**8.** The Plaintiff contests the Defendants' figures by contending that the relevant labor market for District II HRS professional positions must include other areas of the state, from which applications are sometimes received. This argument is rejected. If labor markets outside District II were considered, additional white applicants would be added to the statistical pool, as well as additional black applicants, leading to an analysis beyond the limits of the

CONCLUSIONS OF LAW

*Limitations—42 U.S.C. § 1981*

██ The Plaintiff cannot maintain this action under 42 U.S.C. § 1981. Since Section 1981 contains no statute of limitations, the most nearly analogous state limitation statute is used. *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976); *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); *Cutliff v. Greyhound Lines, Inc.*, 558 F.2d 803 (5th Cir. 1977). In *Cutliff*, the Fifth Circuit applied former Florida Statute § 95.11(7)(b) (1973), which provides a one-year limitation on "[s]uits for the recovery of wages, overtime, or damages and penalties accruing under laws respecting the payment of wages or overtime" to § 1981 actions for back pay. The successor to the statute considered in *Cutliff* is Florida Statute § 95.11(4)(c) (1979), which expands to two years the limitation on "[a]n action to recover wages or overtime or damages or penalties concerning payment of wages and overtime." Plaintiff contests acts of discrimination allegedly occurring in June and July of 1976.[9] The complaint here was filed in March, 1979, well outside the two-year limitation period.

██ Although the Plaintiff has demanded remedies in addition to back pay, the basis of his complaint is employment discrimination. The Florida "recovery of wages" statute is applicable generally to 1981 employment discrimination cases. *Cutliff* at 805; *Williams v. Western Electric Company*, 618 F.2d 1110 (5th Cir. 1980). Filing of a Title VII charge with the EEOC does not toll the limitations period applicable to a § 1981 claim. *Johnson v. American Railway Express Agency, Inc.*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). All of Plaintiff's § 1981 claims are time-barred.

*The Merits—Title VII*

*Disparate Treatment*

██ The Plaintiff here alleges that the Defendants have discriminated against him by failing to promote him because of his race. In Title VII parlance, this is a disparate treatment theory; the seminal case in this area being *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Proof of discriminatory motive is required in disparate treatment cases. *Teamsters v. U. S.*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). The *McDonnell* decision recognizes, however, that direct proof of intent will always be elusive and offers an alternate method of proof. A prima facie case is established when the Plaintiff shows:

(i) that he belongs to a protected minority

(ii) that he applied and was qualified for a job for which the employer was seeking applicants

(iii) that, despite his qualifications, he was rejected

(IV) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. *McDonnell* 411 U.S. at 803, 93 S.Ct. at 1824. These criteria are not "wooden absolutes," *Peters v. Jefferson Chemical Co.*, 516 F.2d 447, 450 (5th Cir. 1975). "The facts necessarily will vary in Title VII cases, and the specification . . . of the prima facie proof required [by the complainant] is not necessarily applicable in every respect to differing factual situations." *McDonnell*, 411 U.S. at 802 n.13, 93 S.Ct. at 1824. The Plaintiff here suggests that the court substitute for the fourth point of the standard *McDonnell* test a requirement that the Plaintiff show he was better qualified for the position than

figures available here. HRS consists of eleven districts statewide, and if a statewide labor market were relevant, employment figures for professional positions in *all* districts would also be relevant. Moreover, the figures given by Ms. Lombardi for 1977 indicate that even if statewide HRS employment were considered,

no underrepresentation by black males would be shown.

**9.** The only § 1981 claim which would be timely, District Staff Development and Training Consultant (April, 1977), was abandoned by the Plaintiff at trial.

the non-protected applicant who was actually chosen. For the purposes of the present factual situation, the court adopts Plaintiff's suggested requirement as the fourth element of a prima facie case. *See, Adams v. Reed*, 567 F.2d 1283 n.6 (5th Cir. 1978); *Olson v. Philco-Ford*, 531 F.2d 474 (10th Cir. 1976). The *McDonnell* requirement that the position remain open makes no sense where a group of applicants is considered simultaneously and one is selected.

■ The Plaintiff has not proved a prima facie case with regard to any of the four positions in contention here. He was not qualified for either the VR District Program Supervisor or the District Intake Specialist position. He met the basic requirements for the CAMS Specialist and VR Program Analyst positions, but better qualified candidates were selected. Under the standards suggested by the Plaintiff, the legal inquiry ends here, with his failure to establish a prima facie case.

The court is aware, however, that the Fifth Circuit has articulated a slightly different ordering of the proof in an individual disparate treatment case than that suggested by the Plaintiff. *Burdine v. Texas Dept. of Community Affairs*, 608 F.2d 563 (5th Cir. 1979), held, on somewhat similar facts, that the plaintiff had made out a prima facie case.[10] The defendant was then required to rebut: the "defendant must prove that those he hired or promoted were somehow *better* qualified than was plaintiff; in other words, comparative evidence is needed." *Burdine* at 567, citing *East v. Romine, Inc.*, 518 F.2d 332 (5th Cir. 1975).

■ In Mr. Colston's case, the outcome is not changed by an alteration in the order of proof. Under the *Burdine* procedure, the Plaintiff presented a prima facie case on the CAMS position and the Program Analyst position. The Defendants were then required to show, by a preponderance of the evidence, a legitimate, non-discriminatory reason for the rejection. *Turner v. Texas Instruments*, 555 F.2d 1251, 1255 (5th Cir. 1977). The Defendants proved by credible evidence that the candidates hired (Barry Kling for the CAMS position and Rick Wigle for the Program Analyst position) were better qualified than the Plaintiff. When comparative evidence shows that those hired were better qualified than the complainant, a legitimate, nondiscriminatory reason for rejecting the Plaintiff has been articulated. "Although the McDonnell Douglas formula does not require direct proof of discrimination, it does demand that the alleged discriminatee demonstrate at least that his rejection did not result from the two most common legitimate reasons on which an employer might rely to reject a job applicant: an absolute or relative lack of qualifications or the absence of a vacancy in the job sought." *Teamsters v. U. S.*, 431 U.S. 324, 358 n.44, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977). The additional fact that both those hired were adversely affected buttresses the Defendants' case. I have found nothing in the Plaintiff's evidence which suggests that the Defendants' stated reason for the rejection was pretextual.

### Disparate Impact

■ The Plaintiff has proceeded on the alternate theory of disparate impact. He contends that HRS used subjective promotion processes, producing a class-wide discriminatory effect felt by the Plaintiff. In a disparate impact case, the Plaintiff must show that a facially neutral test or employment procedure disproportionately disqualifies a protected class from employment or promotion and is not justified by a "business necessity." *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

10. In *Burdine*, the Plaintiff was a member of a protected class, applied and was qualified for a position, and was rejected. *Burdine* differs from our case in that the position then remained unfilled for several months and was eventually filled by a member of an unprotected class. The time lapse before the hiring and the fact that the Defendant apparently did not consider a number of applicants simultaneously may distinguish *Burdine*. Each of the jobs that Mr. Colston sought produced a large number of applicants who were considered comparatively.

The starting point in a disparate impact case is a showing of the effect of the contested employment practice. The method of making this showing in an individual disparate impact case is troublesome. In a class action, "gross statistical disparities . . . alone may in a proper case constitute *prima facie* proof of a pattern or practice of discrimination." *Hazelwood School District v. U. S.*, 433 U.S. 299, 307–08, 97 S.Ct. 2736, 2741, 53 L.Ed.2d 768 (1977). In an individual case, more may be required. A recent Fifth Circuit case holds that "[s]tatistical disparity between blacks and whites, especially when coupled with direct evidence of racially motivated conduct or language, might also, in a proper case, satisfy plaintiffs' initial burden." *Crawford v. Western Electric Co., Inc.*, 614 F.2d 1300 (5th Cir. 1980). The *Crawford* case cites *Teamsters v. U. S.*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), for the above proposition. *Teamsters* was a pattern and practice case brought by the United States; in addition to gross statistical disparities, the U.S. was able to elicit evidence of over 40 instances of discrimination against specific individuals. *Teamsters* at 338, 97 S.Ct. at 1855. This is a far cry from naked statistical evidence.

The statistical evidence presented by the Plaintiff here, even if given maximum weight and credence, fails to establish a prima facie case of discrimination. The Plaintiff "need only show that the facially neutral standards in question select applicants for hire in a significantly discriminatory pattern." *Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1977). When this showing is not made, the matter of qualifications remains within the employer's prerogative. *Rowe v. General Motors Corp.*, 457 F.2d 348, 358 (5th Cir. 1972). The evidence in this case shows that the promotion practices of HRS have not produced a discriminatory effect on the Plaintiff or on black males in general.

*Conclusion*

The Plaintiff has been unable to show that the Defendants discriminatorily failed to promote him to any of the four positions contested under the disparate treatment theory. Likewise, the Plaintiff cannot prevail on a disparate impact theory complaining of subjective promotion practices, since no discriminatory effect has been shown. Having found for the Defendants on the merits, I do not reach their argument that the 1972 amendments to Title VII are violative of equal protection in specifically exempting federal congressional employees from Title VII protection.