Louis H. AIKENS, Appellant,

v.

UNITED STATES POSTAL SERVICE,
BOARD OF GOVERNORS, Appellees.

No. 79–1574.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 28, 1980.

Decided July 31, 1980.

Dissenting Opinion Sept. 9, 1980.

Dissenting Opinion from Motions to Grant
Extension of Time to File Rehearing
Oct. 14, 1980.

Rehearing Denied Nov. 20, 1980.

L. Harold Aikens, Jr., Washington, D. C., for appellant.

Elliot R. Warren, Asst. U. S. Atty., Washington, D. C., with whom Carl S. Rauh, U. S. Atty., Washington, D. C., at the time the brief was filed and John A. Terry, Asst. U. S. Atty., Washington, D. C., was on the brief, for appellees.

**516**

Before WILKEY, WALD and ED-WARDS, Circuit Judges.

Opinion for the Court filed by Circuit Judge EDWARDS.

Dissenting opinion filed by Circuit Judge WILKEY.

EDWARDS, Circuit Judge:

Plaintiff-appellant, Louis H. Aikens, instituted this action under Title VII of the Civil Rights Act of 1964, 78 Stat. 241, 253, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e *et seq.*, seeking redress of alleged discrimination on the basis of race in his employment with the United States Postal Service. Aikens, who is now retired from the Postal Service, requested relief in the form of retroactive promotions, commensurate retroactive pay benefits, and attorneys' fees. The District Court found that Aikens had failed to make out a prima facie case of racial discrimination under Title VII and ordered that the action be dismissed with prejudice. Aikens now appeals from the District Court decision. For the reasons outlined below, we hereby reverse the decision of the District Court and remand the matter for further proceedings consistent with our judgment in the case.

### I.

Aikens is a black man who began his employment with the Post Office in Washington, D.C. in 1937. He was promoted to his first supervisory position in 1952; subsequently, between 1952 and 1960, Aikens held various jobs at the level of foreman. From 1960 to 1966, he received six promotions that raised him from the foreman level (ranked PFS–7) to the level of Assistant Director, Operations Division for Transit Mails (PFS–15). In 1974, Aikens was upgraded twice, once by virtue of a promo-

tion and once pursuant to a "detail" (temporary assignment). Between 1966 and 1974, however, Aikens was neither detailed nor promoted above his Assistant Director position. His failure to be promoted during this latter period forms the basis of this Title VII suit.

Under applicable Postal Service procedures, an employee who desires consideration for supervisory promotions is required to indicate his job preferences on a Form 1717. Following that procedure, during the entire period from 1966 through 1973, Aikens had on file the appropriate Form 1717 seeking consideration for promotion to any Post Office position ranked above his PFS–15 job. Between 1966 and 1973, there were only four positions in the Washington, D.C. Post Office that were ranked above PFS–15. During that period, several white employees, all with less seniority than Aikens, were promoted above him. After the Job Evaluation Program in 1973, Aikens' job was rated at grade PES–20; however, following the implementation of the Job Evaluation Program, several additional positions were rated above Aikens' job and several junior white employees received details or promotions above Aikens.

Aikens filed an Equal Employment Opportunity complaint with the Postal Service on January 4, 1974. An existing Civil Service Regulation, 5 C.F.R. § 713.214 (1974), required that complaints be filed within thirty days of the alleged discriminatory action. Under this statute of limitations standard, Aikens' complaint was timely only as to four positions for which promotions or details had occurred within thirty days of the complaint; the four positions in question were Mail Processing Officer, Acting Mail Processing Representative, Director, Operations Division, and Customer Services Representative.[1] Accordingly, administra-

---

1. Alleging that the Postal Service's failure to promote him during the entire eight year period, from 1966 until 1974, constituted racial discrimination of a continuing nature, Aikens argues that administrative and judicial review should not have been limited to the four positions for which he filed a timely complaint. In

general, plaintiffs who allege continuing violations can file charges at any time during which the continuing violation has taken place. *E. g., Rich v. Martin Marietta Corp.*, 522 F.2d 333, 348–49 n. 15 (10th Cir. 1975). This theory is inapposite in this case, however, because there is no indication that Aikens was adversely af-

tive and judicial review of Aikens' employment discrimination claim was properly focused on Aikens' failure to be promoted to these four positions.[2]

Following an administrative review, the Postal Service concluded that the evidence of record did not support Aikens' allegation of racial discrimination. This judgment was affirmed by the Appeals Review Board of the Civil Service Commission. Aikens then filed his Title VII complaint in the District Court, which held a trial *de novo* on his claim of employment discrimination. Aikens here appeals a judgment rendered in favor of the Postal Service.

## II.

In *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court articulated the standard that must be met in order for individual complainants to make out a prima facie case of discrimination under Title VII:

The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer contin-

ued to seek applicants from persons of complainant's qualifications.

411 U.S. at 802, 93 S.Ct. at 1824. The Court recognized that the varying factual situations seen in Title VII cases require the application of a flexible formulation for this prima facie proof. *Id.* at 802 n. 13, 93 S.Ct. at 1824 n. 13. In essence, *McDonnell Douglas* requires an individual bringing suit under Title VII to demonstrate that the alleged discrimination did not result from a lack of qualifications or the absence of a vacancy in the job sought. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358 n. 44, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977). Thus, it has been held that the *McDonnell Douglas* test, adopted to fit the factual circumstances of the case, applies in individual actions involving charges of race discrimination in promotion decisions. *President v. Vance*, 627 F.2d 353 at 364 n. 78 (D.C.Cir.1980); *Rich v. Martin Marietta Corp.*, 522 F.2d 333, 346–47 (10th Cir. 1975).

On the record in this case, it is clear that Aikens met the first, third and fourth elements of the test set forth in *McDonnell Douglas*: he is a black man; he sought promotion to higher level positions that became available; and white Post Office employees received the positions. Therefore, it is the second element of the test, having to do with Aikens' qualifications to perform the jobs here in question, that must be addressed in our consideration of this appeal.[3]

---

fected by an employment policy or practice that consistently operated to hold him, or blacks as a class, in the lower echelons of employment. *Macklin v. Spector Freight Systems, Inc.*, 478 F.2d 979 (D.C.Cir.1973); *Rich v. Martin Marietta Corp.*, 522 F.2d at 348. *But see, Cedeck v. Hamiltonian Fed. Sav. & Loan Ass'n*, 551 F.2d 1136 (8th Cir. 1977). Therefore, we consider here only the four positions for which Aikens filed a timely complaint with the Postal Service.

2. The findings of fact in the District Court opinion also focus on Aikens' failure to be promoted to the position of Postmaster. In 1972, Aikens was one of four candidates for the position of Postmaster. Because of the pending Job Evaluation Program and a potential postal reorganization, officials delayed sending

the four names to the selection board. The new job classifications established by the Job Evaluation Program made Aikens ineligible for the Postmaster position. After a new selection procedure, a black man became Postmaster of Washington, D. C. in January 1974. In light of the arguments advanced by counsel during the oral arguments in this case, we do not consider Aikens' claims of racial discrimination related to the Postmaster position.

3. We should emphasize that the question here, involving Aikens' "qualifications," concerns only the evidence necessary to make out a prima facie case. A person may be qualified to perform a job, and thus satisfy the requirements for a prima facie case under *McDonnell Douglas, supra,* and still ultimately fail on his claim of discrimination under Title VII. See

## III.

Upon review of the evidence submitted to the District Court, we are convinced that Aikens offered ample evidence, which was not contested, to demonstrate his qualifications to perform the work in issue. To begin with, we note that the District Court made no finding that Aikens was not qualified for the positions in dispute. Moreover, Aikens' own record of accomplishments attests to his qualifications. He is highly educated, having earned a Master's degree and completed several years of course work towards a Ph.D. Aikens had almost forty years of experience with the Post Office, during which time he held a number of different supervisory positions. Nothing indicates that his performance was ever less than satisfactory. Indeed, his work record indicates that he participated in training and development courses and seminars designed to enhance his performance on the job.

Another indication of Aikens' qualifications was his nomination by Post Office officials for several promotions. During the selection process that occurred before the 1973 Job Evaluation Program, the Regional Office made Aikens one of the candidates for the Postmaster position. Stipulation 35. In addition, when two other positions (including one of those at issue in this case) were filled in 1972, Aikens was the second choice of the Promotion Advisory Board. Stipulation 25–26. If both the Regional Office and the Promotion Advisory Board believed him to be qualified for these higher positions, it seems unlikely that he would not be qualified for the four positions in question here.

■ The promotions that Aikens received in 1974 also attest to his qualifications to perform work at higher levels of employment. Only a few days after Aikens had filed his employment discrimination complaint in January 1974, he received a promotion to Area Logistics Manager, ranked

at job grade PES–21. Shortly thereafter, he was detailed to the position of Assistant Manager of Distribution, PES–24. The very fact of an employee's ultimate promotion has been found to demonstrate that the employee is qualified for promotion. *Sweeney v. Board of Trustees of Keene State College,* 569 F.2d 169, 178 n. 18 (1st Cir.), *vacated and remanded on other grounds,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978), *judgment of district court affirmed following remand,* 604 F.2d 106 (1st Cir. 1979).

■ In its factual finding number 14, the District Court focused on Aikens' unwillingness to accept lateral transfers and noted that promotion depended in part on experience previously attained in various management positions. *See also* findings 10, 13. In so finding, the District Court opinion suggests both that the experience Aikens sacrificed, by declining lateral transfers, was a requirement for promotion and that the lack of that experience reflected adversely on his ability to perform the jobs at issue here. We note, however, that the Postal Service adduced no evidence to demonstrate that experience in the particular lateral positions that Aikens declined was either a qualification required for promotion or related to the positions he sought. Without such evidence of job relatedness, we cannot conclude that Aikens' refusal to accept lateral transfers made him unqualified for promotion. *Cf. Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

■ Because we find that the clear weight of the evidence indicates that Aikens was qualified to perform the jobs in question, and because the District Court did not find otherwise, we must conclude that Aikens made out a prima facie case of race discrimination pursuant to the test set forth in *McDonnell Douglas, supra.*[4]

---

Section V, *infra.* Nothing in this opinion is intended to suggest otherwise.

4. Two additional points require comment. Evidently relying on affidavits offered by the Postal Service, the court below found that Aikens had informed supervisors that he was interest-

## IV.

Even if we were to find that the evidence with respect to Aikens' qualifications was unclear, we would still be required to reverse and remand this case because of certain erroneous conclusions of law in the opinion of the District Court.

■ In conclusion of law number 8, the District Court opinion indicates that plaintiff's claim cannot succeed because he "failed to prove that he was *as qualified or more qualified* than the individuals who were promoted or detailed" (emphasis added). Plainly, this is a misstatement of applicable law and counsel for appellee conceded as much during the oral arguments in this case on appeal. As noted above, the Supreme Court in *McDonnell Douglas, supra,* has made it clear that, in order to make out a prima facie case with respect to the qualification element, an individual complainant in a Title VII suit need only prove that he or she "was qualified for a job for which the employer was seeking applicants." 411 U.S. at 802, 93 S.Ct. at 1825. Nothing in *McDonnell Douglas, supra,* requires a plaintiff seeking to make out a prima facie case to prove that he was the most qualified person for the promotion in question. *See, e. g., Rich v. Martin Marietta Corp.,* 552 F.2d 333, 347 (10th Cir. 1975).

We know of no authority, and the District Court opinion cites none, to support the proposition that plaintiff was required to prove that "he was as qualified or more qualified than individuals who were pro-

moted or detailed." Such a proposition is plainly at odds with the test enunciated in *McDonnell Douglas, supra.* Therefore, we must find that the District Court misapplied the law under Title VII when it imposed such an onerous burden with respect to the proof required of plaintiff in order to make out a prima facie case.

The second legal defect is found in conclusion of law number 7, wherein the District Court ruled that it was "critical" for plaintiff to offer "proof of discriminatory motive on the part of defendant." The District Court opinion concludes that "plaintiff has failed to provide such proof." Following this conclusion, the District Court opinion cites *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

■ The entire thrust of the District Court's conclusion of law number 7 reflects an obvious misapplication of the law under Title VII. First, *Arlington Heights, supra,* was decided on a constitutional basis and the Supreme Court has never held that the constitutional standard for adjudicating racial discrimination claims is identical to the standard applicable under Title VII. *Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). Second, it is true that some Title VII cases do require proof of discriminatory motive, *see International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97

---

ed in only two specific positions. Finding of fact number 11. This finding was offered as if to suggest that, whether or not qualified, Aikens had no interest in the disputed jobs. However, even assuming that the affidavits were properly admissible (a question which we need not address), it is clear that they were not dispositive of Aikens' claim. Aikens had filed Form 1717 to demonstrate his interest in *all* Postal Service positions higher than his own, and *he had done nothing to withdraw those forms.* The Postal Service had articulated no policy that foreclosed an employee from promotion to a position for which a current Form 1717 was on file, merely on the strength of his expressed interest in promotion to other positions. Because Aikens was not offered any of the four positions, he never had the opportuni-

ty to demonstrate his disinterest effectively by declining the positions. Furthermore, we cannot accept the government's contention that a plaintiff in a Title VII suit, *as a part of his* demonstration of qualifications, is required to describe the positions in dispute. As the Supreme Court suggested in *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975), the burden of describing the jobs in dispute rests with the employer. The plaintiff need only prove that he is qualified for the positions the employer has described and intends to fill. We note, however, that the nature of the Postal Service jobs involved was not actually at issue here and the government did not claim that Aikens' description of the positions was inaccurate.

S.Ct. 1843, 1854–1855, n. 15, 52 L.Ed.2d 396 (1977), and a showing of motive may constitute plaintiff's proof that the allegedly legitimate employment consideration articulated by the defendant is merely a pretext for unlawful discrimination. However, the prima facie case in a suit alleging individual discrimination does not require a showing of discriminatory motive. *McDonnell Douglas, supra,* which established the elements of the prima facie case, simply does not impose that burden on the plaintiff.

### V.

■ Since the plaintiff made out his prima facie case, which raises an inference of discrimination, the burden now shifts to the defendant, under the standards of *McDonnell Douglas, supra.* The government may meet Aikens' prima facie showing by articulating a legitimate, nondiscriminatory reason for its failure to promote Aikens to the four positions at issue here. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The government's burden is "that of proving that [they] based [the] employment decision on a legitimate consideration, and not an illegitimate one such as race." *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978).

■ Accordingly, the government is now to be given the opportunity to offer the required proof concerning the legitimacy of the promotion decisions here at issue. At trial, no evidence indicated that the white employees who received promotions to the four positions at issue were as, or more, qualified than Aikens for those jobs. That evidence may be offered on remand, along with other evidence that is relevant and material in rebutting Aikens' prima facie case of discrimination.

■ Should the government succeed in meeting its burden, Aikens shall then have the opportunity to introduce evidence that the justifications offered by the Postal Service are merely pretexts for discrimination. *Furnco Construction Corp.,* 438 U.S. at 578, 98 S.Ct. at 2950; *McDonnell Douglas,* 411 U.S. at 804–805, 93 S.Ct. at 1825–1826.

Because we find that Aikens made out his prima facie case of racial discrimination and that the District Court applied incorrect principles of law in considering plaintiff's case, we reverse the order of the District Court and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

WILKEY, Circuit Judge, dissenting:

On 31 July 1980 the majority of this panel reversed a district court ruling which had granted summary judgment to defendants–appellees in this Title VII suit on grounds of appellant's failure to make out a prima facie case of racial discrimination. The panel opinion found two errors of law in the district court's decision, first in its statement that it was "critical" for plaintiff–appellant to show racially discriminatory motive on the part of defendant, and second in its requirement that, to make a prima facie case, plaintiff must show he was "as qualified or more qualified than individuals who were promoted or detailed."[1]

In addition, the panel majority made its own assessment of the factual issue of appellant's qualifications. The majority looked primarily to the Supreme Court's standard in *McDonnell Douglas Corp. v. Green,* which held that a Title VII plaintiff can establish a prima facie case of racial discrimination by showing:

(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection the position remained open and the employer continued to seek

---

1. *Aikens v. United States Postal Serv.,* 642 F.2d 514 at 519 (D.C.Cir.1980).

applicants from persons of complainant's qualifications.[2]

Of these criteria only the second, in its requirement that plaintiff be "qualified," is at issue in this case. The panel majority concluded that the weight of evidence on record so clearly indicated plaintiff's qualifications for the jobs in question that this court could hold plaintiff to be "qualified" without remanding the issue for a district court finding based on the proper standard.

I agree with the majority that the district court applied an inappropriate legal standard in ruling that it was critical for plaintiff to prove discriminatory motive on the part of defendant. Although the Supreme Court has stated that for "disparate treatment" cases of this sort proof of discriminatory motive is "critical," [3] the Court has allowed such motive to be proven indirectly in certain circumstances, by inference from "the mere fact of differences in treatment." [4] Because the district court's opinion appears to require direct proof of discriminatory motive, I concur with the majority insofar as they vacate the district court's grant of summary judgment on this erroneous legal basis.

I strongly disagree, however, with the majority's treatment of the standard for permissible indirect proof of discriminatory motive and its rationale. The Supreme Court intended its *McDonnell Douglas* standard to identify those situations where, based on plaintiff's initial evidence, the employer's decision appeared "more likely than not" to be a discriminatory one.[5] For the standard to accomplish this goal, the Court acknowledged that it must be applied flexi-

bly, since in light of variations in circumstances of Title VII suits, the specified standard "is not necessarily applicable in every respect to differing factual situations." [6]

In the present case the majority has applied the second *McDonnell Douglas* criterion inflexibly with an irrelevant and mechanical standard of "qualification" that bears little relationship to plaintiff's ability to perform well in the managerial positions in question. As a result the majority's concept of a prima facie case has little if anything to do with the likelihood that defendant denied a position to plaintiff for racially discriminatory reasons, which is what the *McDonnell Douglas* standard is supposed to determine. Although this approach finds support in some other lower court opinions, the present case illustrates a potential for the application of the *McDonnell Douglas* standard to lose touch with its purpose. Far from this outcome being required by the Supreme Court's decisions in this area, it is not consistent with the reasoning of those decisions. I therefore feel compelled to detail my disagreement with the majority's approach and set forth a more appropriate alternative consistent with the purpose of the *McDonnell Douglas* test.

The four positions to which appellant sought promotion by the Washington, D. C., Post Office are managerial in nature. Appellant was already among the highest ranking officers in the D. C. Post Office when he applied for promotion to the four positions of Mail Processing Officer, Acting Mail Processing Representative, Director of the Operations Division, and Customer

---

2. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

3. *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15, 97 S.Ct. 1843, 1854–1855 n.15, 52 L.Ed.2d 396 (1977). The present case is an instance of alleged disparate treatment on grounds of race, rather than one of "disparate impact," which involves "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Id.*

4. *Id.*

5. *Furnco Constr. Co. v. Waters*, 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). *See International Bhd. of Teamsters v. United States*, 431 U.S. 324, 357–58 & n.44, 97 S.Ct. 1843, 1865–1866 & n.44, 52 L.Ed.2d 396 (1977); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801–02, 93 S.Ct. 1817, 1823–1824, 36 L.Ed.2d 668 (1973).

6. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 n.13, 93 S.Ct. 1817, 1824 n.13, 36 L.Ed.2d 668 (1973).

Services Representative.[7] To be "qualified" for any managerial position at this level requires above all that one have managerial ability–an ability to supervise, direct, and cooperate with others; a personal sense of responsibility and initiative; an ability to motivate other persons; and a familiarity with the substantive area of activity for which one is responsible. Such traits of managerial ability are intangible and defy measurement by "objective" means using figures or paper credentials.

To assess plaintiff's qualifications for these positions, however, the majority inexplicably did look first to paper credentials, citing appellant's Master's degree, course work towards a Ph.D., forty years experience in the Post Office, including supervisory positions, performance ratings not less than satisfactory, and participation in performance–enhancing courses and seminars. The majority also noted that appellant had been nominated as a candidate for D.C. Postmaster by the Regional Office (though the list recommended by the District Office did not include him).[8] In addition, appellant was the second choice of the Promotion Advisory Board for two other positions, and he was promoted subsequent to the events at issue here.[9]

The problem with assessing qualifications based on such quantifiable, "objective" criteria is that these criteria bear very little relationship to an employer's real–life decision about which candidate he would prefer for a managerial position. That decision must typically be based much more on a comparative assessment of the subjective managerial talents of candidates than on the basis of objective paper criteria. To say that a candidate meets certain minimal objective criteria for a managerial position says virtually nothing about whether a nondiscriminatory employer would choose him over other candidates. As a result, a judicial determination that a Title VII plaintiff

is "qualified" in this sense for a managerial position says virtually *nothing* about whether the employer's decision is "more likely than not" to be a racially discriminatory one which is the issue to be determined at the time tests for a prima facie case are applied.

Of course this problem is apt to occur inevitably when one assesses qualifications for a managerial position according to an absolute test rather than a comparative test. If one looks only at the absolute qualifications of the individual isolated from his qualifications relative to other candidates, one is artificially limited to the objective, quantifiable type of criteria: even if they are not significant for real–life decisions, at least they are "something" for a court to go by.

But this dilemma occurs only if we rule out the possibility of a relative assessment of the less tangible qualifications of the various candidates for a managerial position. By a comparative technique one can assess how well one candidate has performed in the past compared to another candidate: compare the performance of organizational units for which the candidates were responsible, compare the subjective evaluations from their supervisors in the past, or perhaps compare their general reputations among those for whom they worked. This type of comparison would bear at least some relationship to employment decisions made in the real world. If a court found that a minority candidate was approximately as qualified as a nonminority candidate in this sense, the finding truly would bear some relation to the likelihood that the employer made his decision based on discriminatory racial grounds.

The district court attempted to do precisely this in requiring plaintiff to make some showing that he was "as qualified or more qualified than the individuals who

---

7.  *Aikens v. Bolger*, No. 77–0303, Findings of Fact ‘ ‘ 5, 9 (D.D.C. 26 Feb. 1979).

8.  *See id.* ‘ 21.

9.  *Aikens v. United States Postal Serv.*, 642 F.2d 514 at 518 (D.C.Cir.1980).

were promoted or detailed." [10] The majority rejects this approach for lack of authority, and it is true that appellee's counsel was unable to cite authority for such an approach at oral argument.

But I cannot agree that the district court's approach is "plainly at odds" with the *McDonnell Douglas* test.[11] The *McDonnell Douglas* Court acknowledged the flexibility necessary if its prima facie case standard is to serve its intended purpose,[12] and further disclaimed any intent to set a specific test for evaluating employment qualifications. On the contrary, the Court expressed a concern that qualifications tests "bear a demonstrable relationship to successful performance of the jobs." [13] More recently, the Court has stated that relative as well as absolute assessment of qualifications is relevant to the *McDonnell Douglas* standard. The Court explained that under *McDonnell Douglas* plaintiff proves discrimination indirectly by presenting evidence to exclude the two most common nondiscriminatory reasons for an employer's rejection of a candidate: "an absolute *or relative* lack of qualifications or the absence of a vacancy in the job sought." [14]

In light of the purpose of the *McDonnell Douglas* test and the realities of employment decisions, this language should not be ignored, despite the lack of lower court cases that have followed the relative qualifications branch of this standard. The fact is that some employment decisions are made primarily by absolute, noncomparative criteria, while others depend predominantly on relative qualifications in a comparison among candidates. The former approach applies generally for positions that require objectively verifiable skills; if the applicant meets the objective standard for employment, he is "qualified." The relative approach, on the other hand, applies to positions requiring traits that can only be evaluated subjectively, by comparison with other candidates; in this category managerial positions are the clearest example.

Under a comparative approach, plaintiff need not show that he was the most qualified candidate, only that he was approximately as qualified in light of comparative criteria. Although this is necessarily a somewhat vague standard that requires discretion on the part of the trial court, the absolute standard is also vague and discretionary when applied to cases that involve managerial positions with qualifications that cannot be stated in terms of objective criteria. The essential difference is that the relative standard is a discretionary one bearing some relation to actual hiring decisions for managerial positions, while the absolute standard is a discretionary one bearing little or no relation to actual managerial hiring decisions.

Significantly, the Supreme Court's application of the absolute qualification approach has in fact been in the context of positions with objectively verifiable skills; hence the majority's opinion here represents an unthinking extension of Supreme Court doctrine, an extension which is inconsistent with the doctrine's overall purpose. *McDonnell Douglas* involved a plaintiff who had been fired from a job as a mechanic and laboratory technician.[15] For such a job, the ability to perform the required skills can be objectively verified, far more easily at least than for a manager. Similarly, in

**10.** *Aikens v. Bolger*, No. 77–0303, Conclusions of Law ˹ 8 (D.D.C. 26 Feb. 1979).

**11.** *Aikens v. United States Postal Serv.*, 642 F.2d 514 at 519 (D.C.Cir. 1980).

**12.** *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 n.13, 93 S.Ct. 1817, 1824 n.13, 36 L.Ed.2d 668 (1973).

**13.** *Id.* at 802 n.14, 93 S.Ct. at 1824 n.14 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971)).

**14.** *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 n.44, 97 S.Ct. 1843, 1866 n.44, 52 L.Ed.2d 396 (1977) (emphasis added).

**15.** *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 794, 93 S.Ct. 1817, 1820, 36 L.Ed.2d 668 (1973).

*Furnco Construction Corp. v. Waters,*[16] the Court applied the *McDonnell Douglas* standard in the context of bricklayers,[17] for whom one could judge qualifications in objective, verifiable terms of ability and experience in performing a particular task. So long as we are dealing with nuts, bolts, and bricks, the majority approach would doubtless work well to identify discriminatory hiring practices.

To extend an absolute qualifications approach to managerial positions, however, not only defeats the purpose of the *McDonnell Douglas* standard, but also leads to distorted and unjust results. If courts establish minimal objective criteria for qualifications in managerial positions,[18] *then any supervisory employee satisfactorily performing his present job can claim to be "qualified" in this vague sense for promotion to the next higher position.* The consequences are clear for any employer who contemplates promoting a superior nonminority employee over a marginally qualified minority employee: since the minority employee will automatically be able to make out a prima facie case of discrimination, it will make no sense for the employer to promote the superior candidate over the marginal candidate unless he has available sufficient resources of time and money to rebut the prima facie case in extended litigation.

The only alternative strategy for the employer would be to devise some type of "objective" qualifications test for managerial employees, which would preclude a prima facie case by showing that those passed over for managerial positions were not "qualified." But the difficulty, not to say impossibility, of devising an objective test to identify those who would be best in a managerial position, simply highlights the absurdity of using an absolute, objective test rather than a relative one to determine managerial qualifications under *McDonnell Douglas*.

We recognize, of course, that comparative criteria may always come into evidence at the stage of a Title VII suit at which defendant attempts to rebut plaintiff's prima facie case. As a matter of theory this may seem of equal value to a relative qualifications approach used at the threshold stage of assessing the sufficiency of plaintiff's prima facie case. But as a practical matter of litigation expense, the former is likely to be significantly more costly than the latter. To impose this added expense of making an affirmative defense on a defendant, who has not even been shown more likely than not to have discriminated, is neither fair nor consistent with usual trial procedure.

It should be recognized that a relative test of qualifications would generally be more difficult to satisfy than an absolute, objective test. But this merely corresponds with the fact that racial discrimination is by nature more difficult to prove by indirect evidence for a highly subjective decision—such as the hiring of managers—than for decisions made according to objective and verifiable criteria. Courts must weigh the danger of unpunished discriminatory decisions in the hiring of managers, against the unfairness of subjecting innumerable innocent employers to the cost of overcoming a prima facie case built on thin air. By applying a relative qualifications test where appropriate, courts at least conform their decisions to the realities of hiring decisions and thus increase the probability of just results.

By contrast, the use of an absolute test of qualifications for managerial positions can easily force the burden of rebutting a prima facie case upon an employer who has never come close to making a discriminatory hiring decision. Even an employer who actively favors minority applications could come under the gun, if he just once passed over a marginal minority candidate for promotion to a managerial position in favor of a highly qualified nonminority candidate. The potential for a standard to lead to such possible injustice should give us pause.

16. 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

17. *See id.* at 569–71, 98 S.Ct. at 2945–2947.

18. *See, e. g., Rich v. Martin Marietta Corp.*, 522 F.2d 333, 347–48 (10th Cir. 1975).

In the present case we do not know· whether defendant discriminated in its promotion decision. The possibility that we may be finding a prima facie case against a totally nondiscriminatory employer is suggested, however, by the district court's findings that (1) during the period in question "blacks as well as whites were promoted or detailed to positions above plaintiff's position," (2) there has been a considerable increase in the number of high level black employees in the D.C. Post Office during and since the period covered by the complaint, and (3) at the present time "almost all high level positions are held by blacks." [19]

On the present record it is unclear whether plaintiff was as qualified as other candidates for the managerial positions in question. I would remand to the district court for a finding on this issue based on relative as well as absolute criteria of qualification, but not requiring direct proof of discriminatory motive on the part of defendant. I therefore dissent from the majority's entering a finding of qualification instead of remanding this issue to the district court.

## ORDER

Upon consideration of the motions of both the appellant and the appellees to further extend the time within which to file petitions for rehearing and/or to suggest rehearing en banc, it is

ORDERED, by the Court, that the motions of both the appellant and the appellees are granted and the time within which parties may petition for rehearing and/or suggest rehearing en banc is granted to, and including, October 23, 1980.

19. *Aikens v. Bolger*, No. 77–0303, Findings of Fact ‘‘ 15–16 (D.D.C. 26 Feb. 1979).

1. Judge Wilkey agreed that the case should be remanded because the trial judge misapplied the legal standard.

2. The Postal Service was apparently refering to Rule 8(h) of the General Rules of the D.C. Circuit Court of Appeals. That rule requires that "[a]ll motions requesting permission ... to extend the time for filing briefs must be filed not less than 10 days before the main briefs are

Dissenting opinion from motions to grant extension of time to file rehearing filed by *Circuit Judge* EDWARDS.

EDWARDS, *Circuit Judge*, dissenting:

A majority of the panel in this case has · voted to grant the appellee, the U.S. Postal Service, *two* extensions of time in which to file a petition for rehearing and a suggestion for rehearing en banc. Because I find these actions unjustified, I dissent from the orders granting the requested extensions.

I recognize that it is not commonplace for a member of this court to issue an opinion in response to a request for an extension of time. Nevertheless, because I believe that the instant case presents such an egregious example of a misuse of the judicial process, I am constrained to set forth my views. I am also concerned that, by granting extensions of the sort here considered, the court may inadvertently encourage future misuses of the judicial process.

In order to explain my position, it is necessary to set out in detail the sequence of events in this case. The majority opinion, reversing the District Court and remanding the case for further proceedings, was issued on July 31, 1980. Judge Wilkey, concurring in part and dissenting in part, issued a separate opinion on September 9, 1980.[1]

On August 14, 1980, the appellee filed two motions. The first was for leave from this court to file a motion for an extension of time. This first motion was necessary because, as it acknowledged, the Postal Service failed to comply with the "ten-day rule."[2] The second motion filed on August 14 was for a thirty day extension of time in

due to be filed." Thus, assuming that Rule 8(h) applies, the request for extension must be filed 10 days before the petition and suggestion for · rehearing are due.

Petitions for rehearing and suggestions for rehearing en banc must be filed "within 14 days after entry of judgment." Federal Rules of Appellate Procedure 40(a). *See* FRAP 35(c) (setting the time for filing a suggestion for rehearing en banc as the time set in Rule 40 for filing a petition for rehearing).

which to file a petition for rehearing and a suggestion for rehearing *en banc.* A majority of the panel granted both of these motions on August 18, 1980, and gave the Postal Service until fourteen days after the dissenting opinion was filed (i.e. until September 23) to file its petition and suggestion.

The Postal Service indicated that it failed to make a timely request for an extension "because of vacation schedules and because the delay caused by the need for coordination between the Department of Justice, the United States Attorney, and the United States Postal Service." The Postal Service also indicated that the extension of time was needed for consultation among the appropriate counsel at the Department of Justice, the Postal Service, and the U.S. Attorney's office to determine whether a petition and suggestion should be filed.

On September 22, 1980, one day before the Postal Service's petition and suggestion were due, the Postal Service again requested an extension of time to file the petition and suggestion for rehearing, this time until October 20. The reason given for this second extension was to "conclude" consultation with the U.S. Attorney and the Department of Justice on whether a petition should be filed.

On September 23, 1980, the appellant, who was successful in his appeal to this court, also filed for, and was granted, a thirty day extension of time in which to file a petition for rehearing and suggestion for rehearing *en banc.*[3]

As a result of these extensions, the Postal Service will have had from July 31 until October 23, 1980, a total of twelve weeks, to file a petition for rehearing and a suggestion for rehearing *en banc.* Not only has the Postal Service required ten weeks of extensions to determine whether to file a petition, but it has repeatedly waited until the last minute to file the motions for extensions of time.

The parties' reasons for the requested extensions of time—vacation schedules, travel plans, and consultation—do not, in my mind, justify a ten-week extension. Unwarranted extensions of time, particularly in cases such as this one,[4] simply delay justice for the successful party without benefitting the party seeking a rehearing. The public, as well as litigants, often complain of the slowness of the judicial process. Post-judgment delays must be all the more frustrating to the parties affected by the litigation and bewildering to the public at large.

The lawyers, it seems, are no less busy six weeks after the judgment is handed down than two weeks after. If this court would decline to grant extensions of time, except for truly good cause shown, lawyers will meet filing deadlines, and this court can expeditiously dispose of its cases. Thus, because I believe the Postal Service has shown no good cause for this second extension of time, I dissent from the panel's decision to grant it.

---

3. Appellant attributed his delay in filing to "travelling by appellant's attorney and the demands of his new job." Of course, it is not clear why appellant, who was successful on appeal, is filing for an extension.

4. In this case, all three judges on the panel voted to remand the case because the trial judge misapplied the law. Although he disagreed with certain of the holdings in the majority opinion, even Judge Wilkey, in his separate opinion, agreed that "the district court applied an inappropriate legal standard," and he concurred "with the majority insofar as they vacate the district court's grant of summary judgment on this erroneous legal basis."