Bobbie Rae **PINCKNEY**

v.

**COUNTY OF NORTHAMPTON, Martin J. Bechtel, Thomas R. Hahn, James A. Hemstreet, Northampton County Children's Bureau and Nancy R. Haley**

Civ. A. No. 75–2770.

United States District Court, E. D. Pennsylvania.

April 21, 1981.

Charles W. Bowser, William H. Bishop, III, Philadelphia, Pa., for plaintiff.

Edward H. Feege, Allentown, Pa., for defendant.

## MEMORANDUM AND ORDER

TROUTMAN, District Judge.

### I. INTRODUCTION

In this employment discrimination action instituted under the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and the Civil Rights Act of 1871, 42 U.S.C. § 1983, against the County of Northampton, former county commissioners, former county Children's Bureau and its executive director, plaintiff, a black female, alleges that the defendants failed to promote her to the position of Social Worker III on January 1, 1973, because of her race and that defendants promoted two white persons even though neither, in terms of past performance or ability, possessed better qualifications than plaintiff, who seeks reinstatement to her former employment as Social Worker III, back pay and attorneys' fees. In October 1976 the Court granted in part defendants' motion for summary judgment. See Pinckney v. County of Northampton, 433 F.Supp. 373 (E.D.Pa.1976). The Court, sitting without a jury, tried plaintiff's remaining claims in January 1980. The following memorandum shall constitute findings of fact and conclusions of law required by Fed.R.Civ.P. 52.

### II. JURISDICTION

Plaintiff properly invoked jurisdiction under 28 U.S.C. § 1331(a) and 1343(4) and 42 U.S.C. § 2000e–5(f)(3). Plaintiff also complied with the jurisdictional prerequisites for a Title VII action by filing charges of discrimination with the Philadelphia district office of the Equal Employment Opportunity Commission in August 1973. The district director thereof issued a determination that reasonable cause existed to believe that a violation of Title VII had been committed. In August 1975 the EEOC issued a notice of Right to Sue letter to plaintiff, who commenced this action within ninety days thereafter. See Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974).

### III. BACKGROUND

From May 1970 through March 1973, the relevant time frame in this action, the individual defendants, Bechtel, Hahn and Hemstreet, were commissioners of defendant Northampton County, a county of the fourth class within the Commonwealth of Pennsylvania. Defendant Children's Bureau had been formed by the county commissioners in 1965 to provide public social services to dependent and delinquent children residing within the county. Since the Commonwealth provided a considerable portion of the funding for the services of the Bureau, the county and Bureau agreed contractually with the Commonwealth to submit to the Department of Public Welfare an

annual plan describing the services to be provided during the coming year and a budget estimate therefor. Each year the Department of Public Welfare reviewed these documents, conducted on-site inspections of the agency's programs, and later approved the plans.

The county commissioners also entered into a contract with the Commonwealth wherein they agreed that the provisions of the Pennsylvania Civil Service Act and the regulations of the Civil Service Commission would apply to employees of the Bureau with certain modifications regarding salary, working hours and fringe benefits. Pursuant thereto, in considering hirings and promotions, the Bureau submitted requests for lists of eligible employees from the Pennsylvania Civil Service Commission and agreed to employ or promote from the list one of the top three names listed. Likewise, in accordance with regulations of the Commonwealth, the commissioners appointed for the Bureau an Advisory Board comprised of lay persons to advise both the commissioners and the Bureau's executive director on agency policies and procedures.

The commissioners hired defendant Haley, a white woman, and assigned her to the Bureau in September 1965, the agency's first year of existence. She became the first supervisor of caseworkers in the Bethlehem area of the county. In April 1968 the commissioners appointed her as Acting Director of the Bureau. At that time she had no previous managerial experience in such areas as administrative decision making, budgeting or personnel relations. In October of that year the commissioners appointed her as director, a post she held during the entire period of plaintiff's employment.

From 1970 to 1973 the Bureau experienced rapid growth in terms of the services which it furnished, including those formerly rendered by a private agency, the Children's Aid Society of Northampton County. An equally rapid growth in the number of employees paralleled these developments. In January 1970 the agency staff consisted of the director, two supervisors, thirteen caseworkers and six clerical employees. By December of 1973 the agency staff had grown to include the director, four supervisors, one full-time and one part-time social workers, twenty-two full-time and one part-time caseworkers, two child welfare aides and eleven clerical employees.

The Bureau employed plaintiff from May 4, 1970, through June 29, 1973, as a Social Worker II. At the time of plaintiff's hire, Haley was the only supervisor at the Bureau. During the employment interview, plaintiff informed Haley that she desired to join the Bureau because the agency's growth afforded her an opportunity to become a supervisor. However, she would not accept the starting annual salary of $9,454. To resolve this problem and to facilitate hiring plaintiff, Haley first obtained the approval of the county commissioners to engage plaintiff at an amount higher than the agency's initial starting salary and later from the Department of Public Welfare and the Civil Service Commission of the Commonwealth. After conferring by telephone with the personnel coordinator of the Commission, Haley obtained from another child welfare agency in Lehigh County a letter indicating that an individual with plaintiff's qualifications would start at an annual salary of $10,000. Ultimately, the Civil Service Commission and the Department of Public Welfare agreed to a beginning salary for plaintiff of $10,432, which, in turn, the county commissioners approved. Plaintiff received notification in April 1970 that she had been awarded a probationary appointment with the Bureau as a Social Worker II and that with satisfactory performance she would be granted regular Civil Service status at the end of her one-year probationary period.

At the time of hire, plaintiff did not have Civil Service status. Consequently, Haley filed the necessary forms with the Commission, which eventually returned a list containing two names, including plaintiff's, for the position of Social Worker II at the Bureau. The other name on the list had a point factor rating of 100; plaintiff had a rating of 71.43. However, plaintiff's residence within the county allowed her selec-

tion despite the inferior score. Eventually plaintiff received her Civil Service certification.

Plaintiff supervised a number of caseworkers handling protective services. Initially, she worked out of both the Easton and Bethlehem offices of the Bureau. In the summer of 1971 Haley assigned her to the Bethlehem office exclusively. In January of that same year the county hired Barbara Sweitzer, a white woman, as a second Social Worker II and assigned her to the Easton office to supervise caseworkers involved in protective services and working out of that office. She also supervised the caseworkers who did foster care studies and the aide engaged in family day-care services. In October 1971 the county hired Joyce McLaughlin, a white woman, as a third Social Worker II. McLaughlin assumed the supervision in protective services of caseworkers formerly supervised by Sweitzer, who accepted supervision of caseworkers in foster care and adoption. In August 1972 McLaughlin also began supervising employees in the in-take unit, which handled the initial referral of cases to the agency. In June 1972 the county employed Nancy White, a white woman, as another Social Worker II in the Bureau. Originally assigned to institutional and day-care supervisory responsibilities, she later took over Sweitzer's duties. Eventually, all placement services, including foster care, were combined under her supervision. Three months later Sweitzer terminated her employment with the Bureau.

As a supervisor, plaintiff's duties included overseeing the day-to-day operations of the Bethlehem office and the performance of caseworkers and clerical employees there. However, plaintiff did not prepare the budget for the Bethlehem office but merely informed Haley of the items which she wished to be included in the general agency budget for the following year. Plaintiff did not hire or interview employees; she had no authority to discipline any employee in writing. Plaintiff never formally met as an agency representative with the commissioners and attended an Advisory Board meeting only once at Haley's request to describe services rendered by the agency to the county's Spanish-speaking population. Plaintiff had no authorization to sign purchase orders or to approve bills for payment.

In March of 1971 due to difficulties in arranging a schedule compatible with her babysitter's, plaintiff approached Haley and asked for permission to arrive later in the morning, to leave earlier in the evening and to skip a lunch hour. Haley informed her that the law required all employers to furnish a meal period for employees. Plaintiff said that, if some arrangement could not be fashioned, she would be required to resign. Haley then secured permission from the chief clerk of the county and, with plaintiff's agreement, placed her on a schedule in which she worked ninety percent of the normal work week. Initially, plaintiff worked every Monday through Friday but less than a full day. Her work week totaled thirty-three hours and forty-five minutes instead of the usual thirty-seven and one-half hours. In January 1972, again to accommodate plaintiff's request for an alteration in working hours because of babysitting problems, Haley allowed plaintiff to work eight hours daily four days a week with Tuesday afternoons off.

In the fall of 1972, as a result of a suggestion made by the Pennsylvania Department of Public Welfare, Haley decided to create two new positions of Social Worker III in the Bureau. The job description promulgated by the Pennsylvania Civil Service Commission for the position of Social Worker III reads in part as follows:

An employee in this class is assigned a wide range of administrative program responsibilities within an area of social welfare services. Important aspects of the work include responsibility for a constant and continuous review and evaluation of the social service program, standards, needs, and the installation of new or improved programs. While the major emphasis is on supervision, there is also considerable administrative detail involved in the work assignment. Employes serving

as administrative assistants in large or complex programs have considerable responsibility for a specific aspect of the overall program. Work of this class is differentiated from the next lower level by the inherent complexity, scope, and magnitude of the social service program. Initiative and independent professional judgment are required in the performance of duties. Work is performed under the general supervision of an administrator who reviews performance and recommendations for conformity with agency and program objectives as well as requirements.

The Northampton County job description for this position recited as typical duties

1. Supervis[ing] a relatively complex, integrated social service program designed to assist in the social rehabilitation and adjustment of children who are dependent, neglected, emotionally disturbed or delinquent [and]

3. Supervis[ing] the workload of social work and casework staff members and volunteers, and provid[ing] professional advice and assistance on case disposition and the purchase of welfare services.

Other requirements established by the county for the job included

[i]nitiative and independent professional judgment ... in the performance of duties. Work is performed under the general supervision of the department Administrator who reviews performances and recommendations for conformity with agency and program objectives as well as legal requirements. Personal qualifications include a Master's degree in Social Work, and four years of professional social work experience, including two years in a consulting, supervisory, or advisory capacity.

Haley testified that she envisioned a Social Worker III as a top administrator reporting directly to her and working out of the Easton office with general responsibility for programs and staff. She testified that one Social Worker III would supervise all programs providing home services to children

such as protective services and day-care. The other Social Worker III would oversee all programs dealing with placement services.

In the fall of 1972 Haley received approval to include these two new positions in the annual plan and budget estimate submitted to the commissioners and then to the Department of Public Welfare for approval in 1973. At the same time Haley considered plaintiff, McLaughlin and White as the three candidates for the two positions. Ultimately she chose McLaughlin and White. The commissioners accepted Haley's recommendations without further inquiry and approved the appointments in February 1973 with retroactive effect to January 1.

Plaintiff filed charges of discriminatory practices with the Pennsylvania Human Relations Commission on May 15, 1973. On March 29 of that year plaintiff tendered her resignation, effective June 29. Plaintiff also filed charges with the Equal Employment Opportunity Commission in June. The PHRC issued a complaint in July and attempted conciliation. The commissioners offered to promote plaintiff to the Social Worker III position effective January 1, 1973, but did not offer to reinstate her with the Bureau. Plaintiff refused to concur with this conciliation agreement, although the commissioners never rescinded plaintiff's promotion.

## IV. THE TITLE VII CLAIM

■ The Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a) provides in pertinent part that

(a) [i]t shall be an unlawful employment practice for an employer—

(1) To fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment op-

portunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

Claims of employment discrimination under Title VII may be pressed in two ways. An individual may allege that he or she has been the victim of a facially neutral practice having a "disparate impact" or that he or she has been subjected to "disparate treatment" based upon his or her race, religion, sex or national origin. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978), *Kunda v. Muhlenberg College*, 621 F.2d 532 (3d Cir. 1980).

■ Under the first theory a facially neutral practice having a disparate impact upon a protected class removes the necessity for proof of discriminatory motive. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Typically, the prospective employer requires applicants to pass a facially neutral test, which results in discrimination due to inferior educational backgrounds common to the applicants. *See, for example, Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Plaintiff must identify this employment practice or policy, benign in appearance or purpose but nonetheless imposing a substantially disproportionate burden upon a protected group as compared to a favored group within the total universe of persons to whom it applies. *Nashville Gas Co. v. Satty*, 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977), *Griggs v. Duke Power Co., supra.* Alternatively, plaintiff may adduce statistical proof of gross underrepresentation of a protected group within the employment setting. *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977).

■ However, where the alleged discrimination involves promotion and "the challenged employment practice consists of so limited a number of discreet episodes [and] the set within which disparateness of impact is to be found is so small in total number", a *prima facie* case of "disparate impact" cannot be based on statistical evidence. *Wright v. National Archives and Records Services*, 609 F.2d 702, 712 n. 14 (4th Cir. 1979). Moreover, where the complaint alleges that an employer based an individual promotion decision upon overt racial considerations, the disparate impact theory does not apply, *Davis v. Board of School Commissioners*, 600 F.2d 470 (5th Cir. 1979), for

> [i]n technical effect the result would be to find a disparate impact *prima facie* case established in any situation where a single white male employee has received an employment benefit—hiring, promotion, etc.—not received by a comparably situated member of a protected group. This would cast upon the employer defendant the difficult business necessity defense rather than requiring of defendant the mere 'articulation of a legitimate nondiscriminatory reason' that could only be overcome by claimant's counterproof of pretext. Disparate impact theory would thereby effectively have swallowed disparate treatment theory as available modes of establishing a Title VII violation.

*Wright v. National Archives and Records Services*, 609 F.2d at 713 n.11.

■ In the case at bar, in view of plaintiff's allegation that defendants refused to promote her because of her race the disparate impact theory does not apply. *See Smithers v. Bailar*, 629 F.2d 892 (3d Cir. 1980). Even assuming availability of this theory, plaintiff points to no employment *policy* or *practice* having a disparate impact upon blacks in Northampton County, and her unique position as the only black social worker residing in Northampton County and qualified for promotion to Social Worker III renders inapposite proof by statistics, which would not bear a sufficient relationship to the conduct at issue. *Smithers v. Bailar, supra, Mazus v. Pennsylvania Department of Transportation*, 629 F.2d 870 (3d Cir. 1980).

Where a plaintiff alleges "disaparate treatment" he or she must prove discriminatory motive, *International Brotherhood of Teamsters v. United States, supra,* which will be inferred if plaintiff can show

> (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants, (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of the complainant's qualifications.

*McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). *See also Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978) (per curiam) and *Furnco Construction Corp. v. Waters, supra.* If plaintiff presents this *prima facie* showing of discrimination, the burden to go forward then shifts to defendant to articulate some legitimate, non-discriminatory reason for the employment decision. Plaintiff then may show that the stated reason was pretextual. *Texas Department of Community Affairs v. Burdine,* —— U.S. ——, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), *McDonnell-Douglas Corp. v. Green, supra, Furnco Construction Corp. v. Waters, supra, Kunda v. Muhlenberg College, supra.* This order of proof applies to employment discrimination based upon race, sex and age, *McDonnell-Douglas Corp. v. Green, supra* (race), *Mazus v. Pennsylvania Department of Transportation, supra* (sex), *Rodriguez v. Taylor,* 569 F.2d 1231 (3d Cir. 1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978) (age), and relates to hiring and promotion. *McDonnell-Douglas Corp. v. Green, supra,* and *Rich v. Marietta,* 522 F.2d 333 (10th Cir. 1975). To accommodate this broad spectrum of circumstances and to maintain a sensible, orderly way of presenting and evaluating evidence, this standard must be flexible and tailored to fit the situation presented by the facts. *Furnco Construction Corp. v. Waters, supra, McDonnell-Douglas Corp. v. Green, supra.* Defendants contend that in a promotion case the fourth requirement of the *prima facie* case becomes superfluous and urge the Court to substitute therefor the requirement that plaintiff show that she was at least as qualified for the position as the selected applicant. Otherwise, defendants reason, the *McDonnell-Douglas* requirement that a position remain open makes no sense, at least where an employer considers a group of applicants for promotion and selects one. Focusing upon this part of the *McDonnell-Douglas* analysis misses its point, presuming that the employer based the decision upon impermissible factors in the absence of another explanation. *See Smithers v. Bailar, supra.* The more pertinent inquiry hones in upon the second requirement. Must plaintiff show only that she possesses the minimum qualifications or that she was *as qualified as* the promoted candidate? Several courts have reached this issue.

In *Aikens v. U. S. Postal Service,* 642 F.2d 514 (D.C.Cir.1980), the plaintiff complained that racial discrimination accounted for defendant's failure to promote him. The district court held that plaintiff did not establish a *prima facie* case of discrimination because he failed to prove that he was "as qualified or more qualified" than the promoted individual. Reversing, the Court of Appeals concluded without explanation that this promotion "plainly" conflicted with the *McDonnell-Douglas* test. *Id.* at 519. In *Colston v. Pingree,* 498 F.Supp. 327 (N.D.Fla.1980), the court required the plaintiff to show in his prima facie case that he was *better* qualified for the position than the selected candidate.

Unfortunately, neither the *Aikens* nor the *Colston* case approaches, realistically enhances or comports with the *McDonnell-Douglas* analysis. The *Colston* requirement imposes upon a Title VII plaintiff an unfair burden of proving superior qualifications in order to establish a *prima facie* case. *Aikens,* on the other hand, forces an equally unfair burden upon an employer, who may be compelled to rebut a *prima facie* case where a promotion decision may not have been inspired by racial animus.

The appropriate order of proof for a *prima facie* case spotlights the likelihood that the employer denied plaintiff a promotion for racially discriminatory reasons. *See Furnco Construction Corp. v. Waters*, 438 U.S. at 576, 98 S.Ct. at 2949 (if the employer's actions remain unexplained, "it is more likely than not" that such actions were based on illegal criteria). Therefore, plaintiff need not show for her *prima facie* case that she was *better* qualified than the promoted candidate, but she must show more than just her minimum qualifications. She must demonstrate that she was *as qualified as* the promoted person. To require that plaintiff make this showing bears a closer relationship to the ultimate purpose of the *McDonnell-Douglas* test and the actual employment decision-making process. As the dissent in *Aikens* indicated, plaintiff must show that she was "approximately as qualified in light of comparative criteria". *Aikens v. U. S. Postal Service*, 642 F.2d at 523 (Wilkey, J., dissenting). To allow plaintiff to satisfy the second *McDonnell-Douglas* requirement by showing only minimum qualifications not only defeats the purpose of this order of proof but also

> leads to distorted and unjust results. If courts establish minimal objective criteria for qualifications in managerial positions, then any supervisory employee satisfactorily performing his present job can claim to be "qualified" in this vague sense for promotion to the next highest position. The consequences are clear for any employer who contemplates promoting a superior non-minority employee over a marginally qualified minority employee: since the minority employee will automatically be able to make out a prima facie case of discrimination, it will make no sense for the employer to promote the superior candidate unless he has available sufficient resources of time and money to rebut the *prima facie* case in extended litigation.

*Aikens v. U. S. Postal Service*, 642 F.2d at 524 (Wilkey, J., dissenting).

More importantly, requiring plaintiff to show that she was as qualified as the promoted person harmonizes with the principle that an individual alleging employment discrimination must demonstrate that her rejection did not result from absolute *or relative* lack of qualifications. *Brotherhood of Teamsters v. United States, supra.* Where all candidates possess the minimum qualifications for promotion but only one person demonstrates superior credentials and ability, the employer can rationally be expected to select that person. Exposing an employer to defending a Title VII action under these circumstances distorts and extends Title VII beyond its intended purview and makes the court a referee second-guessing and supervising the family operations of businesses. *Cf. Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976).

Finally, two other courts addressing the issue agreed with this conclusion. In *Frink v. U. S. Navy*, No. 76–1374 (E.D., 1977), a black naval architect claimed that he had "qualified" ratings and that the Navy failed to promote him because of his race. The court found that he did not make out a *prima facie* case of discrimination, for "McDonnell-Douglas essentially requires the plaintiff to show that he was *as qualified as* the person actually selected." *Id.* at 3. Similarly, in *Oliver v. Moberly Missouri School District*, 427 F.Supp. 82, 86 (E.D.Mo. 1977), the court held that

> where a minority applicant is considered at the same time all other applicants are considered, the plaintiffs must show more than their possession of the bare legal qualifications of employment. She or he must show that the person actually hired was less qualified or only as well qualified as the plaintiff.

*Cf. Texas Department of Community Affairs v. Burdine, supra* (finding error in the Court of Appeals' requirement that the employer show by objective evidence that the person promoted was more qualified than plaintiff, who retains the responsibility to show that the employer treated similarly situated employees unequally). In sum, if a plaintiff alleges discrimination *in promotion*, there must be a showing that he or she was *as qualified as* the person selected.

In the case at bar plaintiff easily met the first and fourth requirements. Although plaintiff never applied for the promotion, Haley considered her nonetheless. Accordingly, the third requirement will be deemed as met. Plaintiff also showed that she had the minimum qualifications for the promotion. Whether she demonstrated adequately that she was as qualified as the selected person need not be resolved on the present record, for defendants have articulated several legitimate, non-discriminatory reasons for their conduct. *See Texas Department of Community Affairs v. Burdine, supra.* First, defendants did not promote plaintiff to Social Worker III because the two positions were full-time and based in the Easton office. Plaintiff previously had indicated a lack of interest in a full-time position in Easton. At the time Haley considered the various candidates, plaintiff worked exclusively from the Bethlehem office on a part-time basis suited to her convenience. Early in 1972, before Haley considered whom to promote, she inquired of plaintiff whether she would be interested in supervising the foster care unit to be acquired from the Children's Aid Society. Plaintiff expressed no interest because of the full-time nature and geographic location. True, this position involved a lateral transfer, not a promotion, but Haley's conclusion that plaintiff's reasons for rejecting this opportunity would apply generally—did not lack a rational basis. Moreover, plaintiff never affirmatively told Haley that these restrictions applied only to lateral transfers.

Second, Haley concluded that plaintiff was not as qualified for either Social Worker III position as McLaughlin or White in light of the promotion provisions of the personnel policies of the Children's Bureau, which provided that "[p]romotion shall also be based on evaluation of past performance and capacity for the vacant position. When these factors are relatively equal for two or more employees, seniority shall be considered". Plaintiff considers her Master's degree in Social Work, her experience both before *and after* her employment with the Bureau and *her own evaluation* of her performance with the Bureau as credentials equal to McLaughlin's and White's. Based upon seniority, plaintiff reasons, she should have been given preference.

Plaintiff called Sheldon Granger, a private consultant who works with private industry and government agencies, as an expert witness. Granger testified that the agency's personnel policies required an initial evaluation of past performance and capacity for the vacancy among the three candidates. If these facts were substantially equal, then preference should be given to the most senior candidate. In his opinion, all three women met the basic educational and professional experience requirements. However, he testified that personality factors could be important in making this evaluation generally and in determining past performance and capacity in the social work field specifically. Granger agreed that personality factors include the candidates' relationship with the employees whom they supervised, with their peers on a supervisory level, with the director of the agency and with representatives of other agencies. An evaluation of who could best move the agency toward its goals would also be relevant. Granger candidly testified that decision-making of this nature necessarily involved very subjective types of judgments upon which reasonable people might disagree.

Haley testified that she considered all these factors as well as the candidates' demonstrated knowledge of social work principles and their performance in the position of Social Worker II. Haley considered McLaughlin and White more knowledgeable of social work and better able to work effectively with others. Haley received requests from four employees for transfers *away* from plaintiff's supervision. Two of these employees informed Haley that plaintiff, in supervising their cases, listened only to a portion of the facts, made a decision and then became intransigent. They also told her that plaintiff frequently berated caseworkers under her supervision either in the lunchroom or in her office in a manner that other employees heard what

transpired. Two other employees returning to duty with the agency specifically requested placement without plaintiff's supervision for the same reasons. Testimony of Ann Machell and Marian Hackman, former caseworkers under plaintiff's supervision, corroborated these facts. The parties further stipulated that another former caseworker, Joyce Hoover, would have testified that she requested a transfer away from plaintiff's supervision because of problems which she encountered with plaintiff.

These requests for transfer away from plaintiff's supervision and reports from other employees of dissatisfaction among employees in the Bethlehem office prompted Haley to distribute a survey in which all caseworkers listed their preferences for the services to which they wished to be assigned. Not a single employee supervised by plaintiff listed as his or her first choice the current assignment to protective services; only two employees placed protective services as one of their top three choices. By contrast, all of the caseworkers whom McLaughlin supervised in protective services in the Easton office indicated as their first choice the same assignment, except for one employee who, for personal reasons, requested in-take as her first choice and protective services next. Plaintiff did not recognize that perhaps her supervisory methods might be causing the problem; at a later supervisors' meeting she attributed the results of the survey to the fact that most caseworkers disliked assignment to protective services. However, the results of the survey from employees in protective services supervised by McLaughlin did not support plaintiff's conclusion. Haley also testified that she considered the need to caution plaintiff in writing not to criticize caseworkers assigned to other supervisors in front of other employees.

In addition, Haley considered the relationships among the three candidates with their supervisory peers. Haley testified that she often received complaints from Sweitzer, who had difficulty dealing with plaintiff. White requested McLaughlin to act as an intermediary between herself and plaintiff because of the same problem.

Plaintiff's sporadic attendance at regularly scheduled supervisors' conferences also created problems within the office. In fact, the other three supervisors, incensed by plaintiff's behavior, requested Haley to speak to plaintiff and to urge her to attend the meetings more regularly so that plaintiff would know why the agency took certain actions. When Haley broached the subject, plaintiff told her that the other supervisors acted unfairly toward her and that, considering her caseload, she attended as regularly as she could. However, Machell informed Haley that plaintiff had told Bethlehem office employees that she considered the meetings worthless and a waste of her time.

Haley further testified that she considered the fact that on several occasions when she and plaintiff disagreed, plaintiff would vilify her either in person or over the telephone in stentorian tones overheard by other employees. At a staff meeting on one such occasion, Haley announced that she had appointed White as liaison with the county Board of Assistance for problem cases; plaintiff angrily labeled the idea ridiculous and exclaimed that she would not cooperate. On another occasion Haley assigned a year-old car to the Bethlehem office; plaintiff inveighed against her in a telephone conversation overheard by other employees. In the fall of 1971 Haley spoke to plaintiff concerning dictation which a caseworker had not completed prior to her transfer to Easton. When Haley pointed out to plaintiff that she had been the caseworker's supervisor for two years and should have assisted her, plaintiff vituperated Haley and accused her of coddling the caseworker, whom plaintiff considered lazy. Plaintiff railed at Haley and called her disgusting and incompetent. Four current or past employees of the Bureau—Hackman, Bodner, Machell and Albarelli—all testified to hearing this rodomontade either in telephone conversations or while they met in Haley's office. Haley did not reprimand plaintiff or take other disciplinary action for these corybantic outbursts because of her, Haley's, inexperience in handling these

situations and her concern that she might subject herself to criticism for improperly supervising plaintiff.

Haley testified that she considered plaintiff's relationship with representatives of outside agencies. She recalled a meeting at which representatives of several other social service agencies were present. Plaintiff dominated the conversation and informed all participants that she and the Bethlehem workers did everything possible and that other agencies including the Bethlehem police did not do enough. At the conclusion the gentlemen who had called the meeting told Haley of his displeasure with plaintiff's conduct and complained that nothing had been accomplished because plaintiff had not allowed others to speak. Haley also received a complaint from a Youth Outreach worker who told her that he had difficulty working with plaintiff who apparently "had a chip on her shoulder". A representative of the county board of assistance also informed Haley that he had received from his employees numerous complaints that plaintiff had harassed them. He asked Haley for designation of a liaison between the Bureau and the board of assistance and suggested White for the job.

In addition, an applicant for employment with the Bureau declined an offer because, he told Haley, his contacts with plaintiff had given him a negative image of the Bureau. One of the defendant commissioners, Hahn, informed Haley that a realtor had complained to him that plaintiff had been rude. From the director of the county Mental Health/Mental Retardation Agency Haley received a letter complaining that plaintiff had supported a family in their efforts to bring into the county two retarded children without first making adequate provisions in the Bethlehem area for their care. In June of 1972 the sergeant in charge of the Juvenile Aid Division of the Bethlehem police department told Haley that he had received many complaints from his officers concerning plaintiff and asked Haley to find someone else to work with the department.

Haley also testified that she had been informed of a meeting at the Bethlehem Housing Authority which plaintiff and Machell attended. At this meeting plaintiff became angry with the executive director of the agency and ranted at him that he should resign or quit if he persisted in his attitude. Machell corroborated this information during her testimony. Haley also testified that with respect to many of these instances, plaintiff may have been justified in her opinion, but her method of conveying her point of view did not conduce to motivating people with whom she dealt; her unprofessional methods created lingering and needless antagonism.

In contrast, Haley never received any requests by caseworkers or other employees for transfers away from the supervision of McLaughlin or White. To the contrary, she received positive comments from caseworkers and other employees from time to time. The results of the employee survey showed that McLaughlin's supervisees appeared satisfied with her. Haley also received comments from White's supervisees that they appreciated her trust in them and that she gave them credit and support in their work. Haley testified that both McLaughlin and White worked well with other supervisors, excepting plaintiff. Haley testified that White and McLaughlin always attended supervisors' meetings except when on vacation or for other compelling reasons. Haley heard compliments, not complaints, concerning White and McLaughlin from outside agencies. Haley further testified that she did not always agree with McLaughlin or White, but they always were able to settle their differences amicably and without friction and that these disagreements did not affect their working relationships.

 Admittedly, subjective evaluations and personal factors inherent in the promotion of professionals, particularly to supervisory positions, figured into and affected Haley's ultimate determination. Personality of candidates was a valid factor to consider in determining an employee's qualifications for promotion to a profession-

al, managerial position when the ability to perform required skills could not easily be verified objectively. Where, as here, job responsibilities included extensive contact with the public, other employees, both superior and subordinate within the organization, and other companies and groups with whom business is conducted, personality definitely affected an individual's ability to perform efficaciously. *See Saracini v. Missouri Pacific Railroad,* 431 F.Supp. 389 (E.D. Ark.1977), *Bradington v. International Business Machines,* 360 F.Supp. 845 (D.Md. 1973), *aff'd,* 492 F.2d 1240 (4th Cir. 1974), *Frockt v. Olin Corp.,* 344 F.Supp. 369 (S.D. Ind.1972). Logically, an individual's past, demonstrated inability to interact effectively and smoothly with others and to cope maturely and professionally with regularly encountered vicissitudes of an employment situation also constitutes a legitimate and important factor. *See Logan v. St. Luke's Hospital Center,* 428 F.Supp. 127 (S.D.N.Y. 1977).

In the case at bar the county's personnel policies as well as the factors addressed by plaintiff's own expert warranted invocation of the reasonable criteria which Haley used and applied in a non-discriminatory manner. At best, her conclusion that plaintiff was not as qualified as the other two candidates had a reasonable basis in fact and comprised a legitimate non-discriminatory reason for her ultimate decision, *Board of Trustees of Keene State College v. Sweeney, supra* ; at worst, defendants' evidence raised a genuine issue of fact as to whether they discriminated against plaintiff. *Texas Department of Community Affairs v. Burdine, supra.*

To show that defendants' articulation was pretextual, plaintiff pointed to the fact that, although the personnel policies required periodic evaluations, she never received a written evaluation from Haley, who explained that the combination of her own inexperience and the rapid growth of the agency between 1970 and 1973 accounted for her failure to evaluate not only plaintiff but also more than one-half of the other employees, supervisors and caseworkers. Thus, white employees as well as plaintiff never received evaluations. Concerning plaintiff, Haley candidly admitted her fear of another ugly confrontation. Plaintiff also pointed to Haley's failure to post or otherwise notify the staff of the impending creation of the Social Worker III position. Haley testified that the personnel policies did not require posting unless the agency recruited from outside its own staff. Plaintiff adduced no regulation requiring posting. Plaintiff also referred to statements which she attributed to Haley during her employment interview in 1970. Supposedly Haley commented that the staff had never been supervised by a black and that most of the agency's clientele were white. Haley denied making any reference to race in the initial employment interview.

Plaintiff also pointed to the fact that Haley, noting her neighbors' prejudices, declined to invite plaintiff into her home on one occasion, which Haley explained was a time when her home was not in a suitable condition for entertaining and the two were in a hurry to get to a meeting. Plaintiff admitted, however, that Haley had invited Shirley Watson, a black woman, to her home numerous times for social visits.

Plaintiff also testified to statements made by Haley to describe her experiences working in a "ghetto" section of St. Louis. Haley allegedly mimicked the speech of blacks by using the term "you all". Haley confessed that she did relate some of her St. Louis experiences to plaintiff but said that she did not convey her remarks in any racial context or derogatory way. Most of Haley's St. Louis clients were white, she explained, and the term "you all" merely reflected their speech as well as her own.

Plaintiff also indicated that in 1970, while Haley was out of town, plaintiff assumed charge of both the Bethlehem and Easton offices. However, at that time, plaintiff was the only supervisor at the Bureau. Naturally she would be assigned this task. Prior to hiring plaintiff, Haley designated a senior caseworker; subsequent to hiring Sweitzer, McLaughlin and White, she placed each of them in charge at various times.

Plaintiff also testified that she asked Haley why she had not been promoted and specifically whether the reason was her race. Haley did not respond. Haley denied that plaintiff ever asked her that question, which Haley said she would have answered negatively to refute the insinuation. Finally, plaintiff pointed to the fact that blacks comprised 1.8% of the population in Northampton County in 1973 when defendants announced the promotions. At that time plaintiff was the only black Social Worker II. The other three supervisors and approximately twenty to twenty-five caseworkers were all white. Although statistics may be offered to prove pretext, *Smithers v. Bailar, supra, Whack v. Peabody & Wind Engineering Co.*, 595 F.2d 190 (3d Cir. 1979), they must bear some direct relationship to the position the applicant sought. *Hazelwood School District v. United States, supra, Mazus v. Pennsylvania Department of Transportation, supra.* Plaintiff's statistical evidence showed that in 1973 plaintiff was one of four Social Worker II or 25% of the agency's supervisory staff. If the caseworkers are also considered, plaintiff was one of twenty-nine or 3.45% of the total professional staff, a figure still much higher than the percentage of blacks in the general population. Moreover, plaintiff was the only black qualified for promotion to Social Worker III in the county. Her statistics fail to show that defendants' reasons for not promoting her were pretextural, particularly in light of the fact that defendants had only three persons from whom to select. *See Morita v. Southern California Permanente Medical Group*, 541 F.2d 217, 220 (9th Cir. 1976), *cert. denied*, 429 U.S. 1250, 97 S.Ct. 761, 50 L.Ed.2d 765 (1977) ("plaintiff's use of only eight persons in his statistical analysis is much too small to have any significant benefit to his position").

In summary, plaintiff was the first supervisor hired by the county upon the recommendation of Haley, who went to considerable lengths to obtain an initial salary for plaintiff in excess of the usual starting salary. To accommodate plaintiff's babysitting difficulties and to avert her resignation, Haley arranged for plaintiff to work part-time. Haley also testified that she hired every black professional employee whose name appeared on a Civil Service list. She also enjoyed a personal friendship with Shirley Watson, a black, encouraged and assisted her in furthering her education and later offered her a supervisory position with the Bureau. Haley belonged to the National Association for the Advancement of Colored People in St. Louis and attempted to join the Allentown chapter thereof upon her arrival in the Lehigh Valley. Under these circumstances, plaintiff has not proven by a preponderance of the evidence that the defendants' stated reasons for failing to promote her were a mere pretext for racial discrimination. Title VII does not authorize preferential treatment to minorities, *Steelworkers v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), or require maximization of minority hiring or promotion. Title VII proscribes employment decisions based upon unlawful criteria. *Texas Department of Community Affairs v. Burdine, supra.* Accordingly, judgment will be entered for defendants and against plaintiff on this claim.

## V. SECTION 1983 CLAIM

The Civil Rights Act of 1871, 42 U.S.C. § 1983, provides in pertinent part that

> [e]very person who, under color of any statute, . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable . . .

To recover, plaintiff must show

> that defendant was a "person", who acted "under color of law" to deprive plaintiff of rights, privileges or immunities guaranteed by the Constitution and laws.

*Arment v. Commonwealth National Bank*, 505 F.Supp. 911 (E.D.Pa.1981) (citations omitted). *See also Dennis v. Sparks*, —— U.S. ——, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980). To establish a violation of the Equal Protection clause, plaintiff must show that defendants acted with a discrimi-

natory intent or purpose. *Village of Arlington Heights v. Metropolitan Housing Authority*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). A racially disproportionate impact will not offend the Equal Protection or Due Process Clauses, *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). To show that an employer acted with discriminatory intent or purpose, plaintiff must establish the *prima facie* showing described in *McDonnell-Douglas Corp. v. Green, supra. Crawford v. Western Electric Co.*, 614 F.2d 1300 (5th Cir. 1980), *Shield Club v. Cleveland*, 370 F.Supp. 251 (N.D.Ohio 1974). Accordingly, the analysis relating to plaintiff's Title VIII claim applies equally to her Section 1983 claim, and plaintiff has failed to prove by a preponderance of the evidence that defendants discriminated against her because of her race or that they deprived her of any constitutional rights. Judgment will be entered in favor of defendants and against plaintiff.